S05A1182, S05X1319. SCHOFIELD v. PALMER; and vice versa.
(621 SE2d 726)

THOMPSON, Justice.

A jury found Palmer guilty of the 1995 murders of his estranged wife and stepdaughter, and he was sentenced to death. This Court affirmed the convictions and sentence. *Palmer v. State*, 271 Ga. 234 (517 SE2d 502) (1999). The United States Supreme Court denied certiorari. *Palmer v. Georgia*, 528 U. S. 1051 (120 SC 591, 145 LE2d 491) (1999). Palmer filed a petition for a writ of habeas corpus on August 4, 2000, and, after the completion of discovery, the habeas court held a five-day evidentiary hearing in October 2003. On March 25, 2005, the habeas court granted relief to Palmer, and vacated his convictions, because of the State's pretrial suppression of evidence favorable to Palmer that it was legally obligated to disclose to him.

See *Giglio v. United States*, 405 U. S. 150, 153-154 (92 SC 763, 31 LE2d 104) (1972); *Brady v. Maryland*, 373 U. S. 83, 87 (83 SC 1194, 10 LE2d 215) (1963). The habeas court also granted relief to Palmer due to ineffective assistance of his trial counsel. In Case No. S05A1182, the warden appeals the habeas court's order granting Palmer habeas relief; in Case No. S05X1319, Palmer appeals the habeas court's denial of his remaining claims. We affirm the vacation of Palmer's convictions due to *Brady* error.

## The Brady Claim

1. *The factual background.* Palmer's wife, Brenda, separated from him and filed for divorce in May 1995. In July 1995, Palmer was jailed because he violated a restraining order to stay away from Brenda. He was released on September 1, 1995, and after his release he made some threats to kill her to other people. He told them he was angry that she might get some of his property in the divorce. He spent part of the day on September 10, 1995, looking for his guns that had been hidden from him while he was in jail. One of his guns was a .22 caliber rifle, later determined to be the murder weapon. Frederico Palmer, Palmer's nephew, testified that Palmer picked him up that night in Palmer's blue Caprice Classic, ostensibly to go to Augusta. Instead, according to Frederico, Palmer enlisted him in his scheme to kill Brenda and her 15-year-old daughter, Christine. Palmer and Frederico drove to Vidette, where Brenda was living, and briefly parked on the side of the road near a laundromat close to Brenda's house while they finalized their plan. Frederico dropped off Palmer, who was wearing gloves and carrying his rifle, near Brenda's house; Frederico then parked the car and joined Palmer on foot. Frederico disconnected the phone line to the house at Palmer's request, and Palmer kicked in the door and shot and killed Brenda and Christine. After leaving the crime scene, Palmer tossed his rifle, shoes, and gloves off a bridge. Two days later, Frederico confessed and led the police to the rifle, shoes, and gloves. He pled guilty to two counts of felony murder and testified for the State at Palmer's trial.

At trial, Palmer's lawyers argued that Frederico had acted alone (at the possible request of a woman who stood to benefit if Brenda did not get any of Palmer's land), and that Frederico had told the police he had witnessed Palmer shoot the victims to deflect attention from him, but he had not understood he could be criminally liable for admitting to being a party to a crime. He had then been forced to take the best deal he could. Frederico also had access to Palmer's guns because he had helped Palmer's son hide the guns.

The State, however, presented a witness, Randy Waltower, who corroborated Frederico by testifying that he saw Palmer's car parked

near the Vidette laundromat around the time of the murders. Waltower, who knew both Palmer and Frederico, testified that he stopped at the laundromat for five minutes to use the pay phone at 10:21 p.m. on September 10 and saw Palmer's car parked nearby on the side of the road. He said he recognized that it was Palmer's car because it was missing part of its front grille, even though he admitted that the car was facing away from him based on Frederico's testimony. He claimed that he turned and looked back at the front of the parked car while driving past it when leaving the laundromat that night. Waltower also spent part of the next day with Frederico and overheard some comments about the crimes when he accompanied Frederico and others to observe the police investigation at the crime scene. In his closing argument, Palmer's counsel argued that Waltower was lying, but admitted that he "[did not] know why he's lying."

Before trial, Palmer's lawyers filed a motion seeking information possessed by the State about any deals or agreements between the State and any witness. See *Giglio*, supra; *Brady*, supra. At a pretrial motion hearing, the district attorney stated that he had complied with the motion by informing the defense about Frederico's plea bargain, and that he would continue to comply with this request. There were no other responses to this motion before trial.

After Palmer's trial and direct appeal were concluded, Palmer's habeas counsel made numerous attempts to obtain information about a confidential informant to the Georgia Bureau of Investigation ("GBI") who had been a part of Palmer's case. The police reports that had been available to the defense before trial indicated that the then-unnamed confidential informant had supplied the GBI with information that incriminated Palmer. However, the GBI and other state agencies resisted the efforts by Palmer in habeas corpus to see the GBI confidential informant file, which was separate from the district attorney's file, claiming that the identity of a confidential informant ("CI") must be kept secret and that revealing the identity of a CI would jeopardize the CI's safety. The GBI also claimed that there was no *Brady* material in the CI file. Palmer argued that he did not want to publicly reveal the identity of the CI, even though it was clear from habeas hearings that Randy Waltower was the CI, but he was interested in learning from the CI file if Waltower had been paid for information. We note that the identity of the CI was not even a secret at Palmer's trial because the district attorney, in his opening statement, told the jury that a confidential informant had tipped off the police to Frederico's and Palmer's involvement in the murders and that the "confidential informant was Randy Waltower, because he started putting two and two together, insofar as any conversation he had heard when the guys got in the car and went down to where the scene was being investigated; he remembered also Crook's (Palmer's

nickname) car having been parked alongside the road just before the murders would have happened." Palmer's habeas counsel maintained that they were interested in discovering in the file whether Waltower had a motive to testify against Palmer.

The GBI resisted any effort by Palmer to obtain access to the CI file during years of habeas corpus discovery. Palmer also lost a lawsuit seeking access to the file under the state Open Records Act. Eventually, the habeas court ordered an in camera review of the GBI confidential informant file during the habeas corpus evidentiary hearing. That review uncovered four documents which showed that, one week after the murders and about five days after Palmer's arrest, the GBI paid Waltower $500 for providing information implicating Palmer as the murderer. The State never told Palmer and his lawyers about this payment.

2. *The law.* Palmer's *Brady* claim was not raised in earlier proceedings so it is not procedurally barred on habeas corpus. See *Turpin v. Lipham*, 270 Ga. 208, 208 (1) (510 SE2d 32) (1998) (claims that were litigated and decided on direct appeal are barred from review on habeas corpus). It is also not procedurally defaulted, even though a habeas claim is defaulted if it could have been earlier raised and was not raised, because Palmer can show cause and prejudice to excuse the procedural default. OCGA § 9-14-48 (d). With regard to the cause-and-prejudice exception, Palmer could not have brought this claim earlier because the State's payment of a witness was concealed from him by the State; therefore, Palmer has demonstrated the "cause" element of the exception to procedural default. See *Lipham*, supra at 209; *Turpin v. Todd*, 268 Ga. 820, 825 (493 SE2d 900) (1997) (to show cause, a petitioner may demonstrate that " 'some objective factor external to the defense impeded counsel's efforts' to raise the claim that has been procedurally defaulted. [Cit.]"). To show prejudice, Palmer must demonstrate actual prejudice that " ' "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." ' [Cit.]" *Lipham*, supra. Because Palmer's underlying claim is a constitutional claim involving the denial of his due process rights under the Fourteenth Amendment, *Brady*, 373 U. S. at 86, the underlying claim and the prejudice analysis necessary to satisfy the cause-and-prejudice test are coextensive. See *Banks v. Dretke*, 540 U. S. 668, 691 (124 SC 1256, 157 LE2d 1166) (2004). Since there is no procedural default if Palmer can prevail on his *Brady* claim, we will therefore turn to the law regarding Palmer's claim under *Brady*.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U. S. at 87. The

prosecution must disclose evidence in its possession that is favorable to the defendant because

> [t]he *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but [is required] to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

*United States v. Bagley*, 473 U. S. 667, 675 (II) (105 SC 3375, 87 LE2d 481) (1985). Because the reliability of a particular witness may be determinative of guilt or innocence, impeachment evidence, including evidence about any deals or agreements between the State and the witness, falls within the *Brady* rule. See *Bagley*, supra at 676; *Giglio*, 405 U. S. at 154-155. It is irrelevant that a police agency may have possessed the favorable evidence without the knowledge of the prosecutor; the law places the responsibility and ultimate burden on the prosecutor for the failure to provide the favorable evidence to the defendant if any part of the prosecution team possessed and suppressed the favorable evidence. See *Kyles v. Whitley*, 514 U. S. 419, 437-439 (115 SC 1555, 131 LE2d 490) (1995); *Head v. Stripling*, 277 Ga. 403, 407-408 (590 SE2d 122) (2003).

In order to prevail on his *Brady* claim, Palmer must show: (1) the State possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different. See *Mize v. State*, 269 Ga. 646, 648-649 (2) (501 SE2d 219) (1998); *Burgeson v. State*, 267 Ga. 102, 104 (2) (475 SE2d 580) (1996). See also *Banks v. Dretke*, 540 U. S. at 691.

3. *Analysis*. The first three parts of Palmer's *Brady* claim are obviously met. The State possessed the information about its payment of a witness against Palmer, never informed Palmer about the payment, and for years fought any attempt by Palmer to find out about it. The key element of Palmer's *Brady* claim is therefore materiality: whether, if the State had complied with its due process obligations and informed Palmer about the witness payment before trial, there is a " 'reasonable probability of a different result.' [Cits.]" *Banks v. Dretke*, 540 U. S. at 699. Palmer does not have to show that he would have been acquitted if he had been able to impeach Waltower with his financial motive for testifying against him; he simply

must show that the State's "evidentiary suppression 'undermines confidence in the outcome of the trial.' [Cit.]" *Kyles v. Whitley*, 514 U. S. at 434.

The habeas court found that the suppressed evidence was material because it deprived Palmer from impeaching Waltower with "an age-old, logical, pecuniary argument that [he] had a motive to lie" when he provided key testimony that corroborated the testimony of Palmer's alleged accomplice. The habeas court concluded that the State must have believed that Waltower's evidence was important because it paid $500 for it, and that the State must have also believed that knowledge of the payment would have affected its case against Palmer because it went to such great lengths to conceal it. Although there is a considerable amount of evidence incriminating Palmer in the murders apart from Waltower's testimony, we affirm the habeas court's finding of materiality and its granting of the writ due to *Brady* error. We cannot countenance the deliberate suppression by the State of a payment to a key witness, and its attendant corruption of the truth-seeking process, in any case, and especially in a death penalty case. An oft-quoted passage by the United States Supreme Court in *Brady v. Maryland* bears repeating:

> Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. . . . A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice.

*Brady*, 373 U. S. at 87-88. Palmer's convictions are vacated and he must receive a new trial. Since Palmer has prevailed on his *Brady* claim, the warden's remaining contentions are moot.

### The Cross-Appeal

4. The habeas court correctly denied Palmer's claim that he is mentally retarded since this issue was decided against him at his trial. See *Head v. Stripling*, 277 Ga. at 409-410 (2). Because Palmer will be retried, he may raise a claim of mental retardation at his retrial if he so chooses. Palmer's remaining contentions in the cross-appeal are moot because his convictions are vacated.

*Judgments affirmed. All the Justices concur.*

DECIDED NOVEMBER 7, 2005.

*Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Sabrina D. Graham, Assistant Attorney General*, for appellant.
*Thomas H. Dunn*, for appellee.